Philip Morris USA, Inc. v. N.C. Dep't of Revenue, 2022 NCBC 58.

STATE OF NORTH CAROLINA

WAKE COUNTY

PHILIP MORRIS USA, INC.,

        Petitioner,

    v.

NORTH CAROLINA DEPARTMENT
OF REVENUE,

        Respondent.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 16006

**ORDER AND OPINION
ON PETITION FOR REVIEW OF
FINAL DECISION**

1.    THIS MATTER is before the Court on Philip Morris USA, Inc.'s Petition for Judicial Review ("Petition") of a Final Agency Decision issued by the Office of Administrative Hearings ("OAH") in a contested tax case arising under N.C.G.S. § 105-130.45. For the reasons discussed below, the Court AFFIRMS the Final Agency Decision, and the Petition is DISMISSED.

*Parker, Poe, Adams, & Bernstein LLP, by Kay H. Miller and Dylan Z. Ray, for Petitioner Philip Morris USA, Inc.*

*North Carolina Department of Justice, by Perry J. Pelaez, for Respondent North Carolina Department of Revenue.*

## I.  NATURE OF THE DISPUTE

2.    This matter involves a dispute between Philip Morris USA, Inc. ("Philip Morris") and the North Carolina Department of Revenue ("the Department") regarding a tax credit afforded to manufacturers of cigarettes for exportation (the "Export Credit"). The statute authorizing the Export Credit, N.C.G.S. § 105-130.45 (the "Export Credit Statute"), was amended effective 1 January 2005, and the parties'

positions differ regarding the effect of that amendment on the generation and use of the Export Credit.

3.      The dispute at its core is over whether the statute, as amended, limited the amount of Export Credit Philip Morris could *generate* in any one year to $6 million, as the Department contends.  Philip Morris' position is that the addition of the language at issue was merely a repeat of a pre-existing cap on the amount of Export Credit that could be *claimed* annually, meaning that any excess Export Credit generated in a year could be carried forward for use in later years.

## II.  PROCEDURAL HISTORY

4.      Beginning in 2016, the Department conducted an audit of Philip Morris' corporate income tax returns for tax years 2012 through 2014.  On 28 September 2018, it issued a report disallowing Export Credits claimed by Philip Morris, followed by proposed assessments for each of the audited tax years.[1]  (R. 66–68.)[2]  Philip Morris objected and requested review pursuant to N.C.G.S. § 105-241.11.

5.      The parties conferred on 24 October 2019, and on 31 August 2020, the Department issued a Notice of Final Determination sustaining the proposed assessments.  (Joint Stipulation of Undisputed Material Facts 11–12, [hereinafter "Jt. Stip."], R. 421.)

---

[1] The Department subsequently conceded that all of the Export Credits claimed by Philip Morris on its 2012 return were proper, as were some of the Export Credits on its 2013 return. Therefore, these amounts are not at issue.

[2] Citations to the Official Record on Judicial Review, (ECF No. 15), are denoted "R. __."

6.      Philip Morris then petitioned the OAH.  The parties filed cross-motions for summary judgment on 3 September 2021.  (Jt. Stip. 14.)  Following a hearing on 22 September 2021, the Administrative Law Judge ("ALJ") issued a decision granting the Department's motion and denying Philip Morris' motion ("Final Decision").  (R. 443–54.)

7.      On 1 December 2021, Philip Morris petitioned this Court for judicial review of the Final Decision.  The matter was designated as a complex business case on 2 December 2021 and assigned to the undersigned.  (ECF Nos. 1, 2, 3.)  The parties then filed their respective briefs, and the Court heard oral arguments on the merits of the Petition on 4 August 2022.  (ECF No. 21.)  The matter is now ripe for disposition.

### III.  STANDARD OF REVIEW

8.      When conducting judicial review of a final agency decision, "the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record."  N.C.G.S. § 150B-51(c).  The Court acts in an appellate capacity to determine whether the evidence supports the agency's findings of fact, whether the findings support the agency's conclusions of law, and whether the conclusions of law are proper statements and applications of the law.  *See Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 12–13 (2002).  The Court may reverse or modify a final agency decision if the agency's findings, inferences, conclusions, or decision are:

        (1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

N.C.G.S. § 150B-51(b).

9.    Matters of statutory interpretation present questions of law and are reviewed *de novo* on appeal. *Proposed Assessments of Additional Sales & Use Tax v. Jefferson-Pilot Life Ins. Co.*, 161 N.C. App. 558, 559 (2003). Under the *de novo* standard of review, the Court considers the matter anew and freely substitutes its judgment for that of the lower tribunal. *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337 (2009). On the other hand, challenges to the agency's fact finding are reviewed under a whole-record test, "which binds the Court to accept fact findings of the administrative agency that are supported by substantial evidence, in view of the entire record." *Home Depot U.S.A., Inc. v. N.C. Dep't of Revenue*, 2015 NCBC LEXIS 103, at **6 (N.C. Super. Ct. Nov. 6, 2015).

10.    The parties agree that the material facts in this matter are not in dispute. Rather, the appeal presents issues of statutory interpretation that the Court reviews *de novo*.

## IV.  FACTUAL BACKGROUND

11.    Philip Morris is a corporation primarily engaged in the manufacture and sale of cigarettes in the United States.  (Jt. Stip. 1–2.)

12.    In 1999, the North Carolina General Assembly enacted the Export Credit Statute granting cigarette manufacturers a tax credit based on the number of cigarettes they manufactured in North Carolina for export each year.  (Jt. Stip. 5.)

13.    As originally enacted, subsection (b) of the Export Credit Statute (the "Credit Subsection") provided:

> The amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with the corporation's base year exportation volume, rounded to the nearest whole percentage.  **The amount of credit allowed is as follows:**

| Current Year's Exportation Volume Compared to its Base Year's Exportation Volume | Amount of Credit per Thousand Cigarettes Exported |
|---|---|
| 120% or more | 40¢ |
| 119%-100% | 35¢ |
| 99%-80% | 30¢ |
| 79%-60% | 25¢ |
| 59%-50% | 20¢ |
| Less than 50% | None |

N.C.G.S. § 105-130.45(b) (1999) (emphasis added).

14.    Subsection (c) of the Export Credit Statute (the "Cap Subsection") established a cap on the credit that could be taken in any tax year "not to exceed the lesser of six million dollars ($6,000,000) or fifty percent (50%) of the amount of the tax imposed by this Part for the taxable year. . . .  This limitation applies to the cumulative amount of the credit allowed in any tax year, including carryforwards

claimed by the taxpayer under this section for previous tax years." N.C.G.S. § 105-130.45(c). In addition, this subsection included a carryover provision for unused portions of the credit generated by the taxpayer: "Any unused portion of a credit allowed in this section may be carried forward for the next succeeding five years." *Id.*

15. The Export Credit Statute was amended in 2003, to be effective 1 January 2005. Among other changes, the amended statute required that the manufacturer export cigarettes and other tobacco products through North Carolina ports to be eligible for the credit. *See* N.C.G.S. § 105-130.45(b) (2003). Provision was made for successors in business to calculate the credit based on their predecessor's exportation volume. In addition, the Credit Subsection was amended to read:

> The amount of credit allowed under this section is determined by comparing the exportation volume of the corporation in the year for which the credit is claimed with the corporation's base year exportation volume, rounded to the nearest whole percentage. In the case of a successor in business, the amount of credit allowed under this section is determined by comparing the exportation volume, rounded to the nearest whole percentage. **The amount of credit allowed may not exceed six million dollars ($6,000,000) and is computed as follows:**

| Current Year's Exportation Volume Compared to its Base Year's Exportation Volume | Amount of Credit per Thousand Cigarettes Exported |
|:---:|:---:|
| 120% or more | 40¢ |
| 119%-100% | 35¢ |
| 99%-80% | 30¢ |
| 79%-60% | 25¢ |
| 59%-50% | 20¢ |
| Less than 50% | None |

N.C.G.S. § 105-130.45(b) (2003) (emphasis added).

16. The amended statute repeated the language of the Cap Subsection in subsection (c). Once again, use of the Export Credit was capped, "not [to] exceed the lesser of six million dollars ($6,000,000) or fifty percent (50%) of the amount of tax imposed by this Part for the taxable year. . . . This limitation applies to the cumulative amount of the credit allowed in any tax year, including carryforwards claimed by the taxpayer under this section for previous tax years." N.C.G.S. § 105-130.45(c) (2003). However, the amendment extended the time frame in which the taxpayer could use "carryforwards" from five years to ten. *Id.*[3]

17. Philip Morris manufactured cigarettes, including those for export, in its facility in Concord, North Carolina. (Jt. Stip. 4.)

18. From the time the North Carolina General Assembly enacted the Export Credit legislation in 1999 until Philip Morris stopped producing cigarettes for export at its Concord facility in 2007, Philip Morris claimed $6 million a year in Export Credit on its corporate income tax return, the maximum amount permitted. (R. 423–24.)

19. Philip Morris contends, however, that it generated Export Credit well in excess of $6 million per year and that it should be permitted to use the excess credit it generated after 1 January 2005, the effective date of the amendment, on its 2013 and 2014 corporate income tax returns. (Seibert Aff. ¶ 7, R. 145.) The Department disagrees.

---

[3] The Export Credit was repealed for cigarettes exported on or after 1 January 2018.

20.     The amount of the disputed Export Credit for tax years 2013 and 2014 is $2,004,366 and $5,266,861, respectively.  (R. 411.)  In addition to disallowing the Export Credit and assessing the amounts in tax, the Department imposed underreporting penalties on Philip Morris in the amount of $200,437 for tax year 2013 and $1,316,715 for tax year 2014.  (R. 445.)

21.     Subsection (f) of the Export Credit Statute provides:

> (f)     Report. – The Department must include in the economic incentives report required by G.S. 105-256 the following information itemized by the taxpayer:
>
> (1)     The number of taxpayers taking a credit allowed in this section.
> (2)     The total amount of exports with respect to which credits were taken.
> (3)     The total cost to the General Fund of the credits taken.

N.C.G.S. § 105-130.45(f) (2003), (R. 302–03).  On 29 April 2009, the Department issued the required report reflecting credits taken by Philip Morris in multiple years.  (R. 167.)

22.     The Department published a "Supplement to 2003 Tax Law Changes" (the "Supplement") following enactment of the amended statute.[4]  (R. 299–301.)  In addition to summarizing substantive changes made in the Export Credit Statute, the Supplement states that a change was made that "clarifies that the maximum

---

[4] The parties included in the Record some, but not all of the pages of the Supplement.  The Court takes judicial notice of the balance of the document.  *See Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *20–21 (N.C. Super. Ct. Apr. 20, 2018).  The preface to the Supplement states that the document is "designed for use by personnel in the North Carolina Department of Revenue" and "is available to those outside the Department as a resource document."  The reader is directed to administrative rules, bulletins, directives, or other instructions issued by the Department for further information.  (N.C. DEP'T OF REV., SUPPLEMENT TO 2003 TAX LAW CHANGES: EXTRA SESSION ON ECONOMIC DEVELOPMENT INCENTIVES (2003) (https://www.ncdor.gov/media/3304/open)) (last visited 28 Sept. 2022).

allowable credit for cigarettes exported during a tax year is six million dollars, before applying the tax limitations provided for in subsection (c)." (R. 301.)

23. On 11 April 2006, Joseph Beggans, Director of State, Local & Misc. Taxes for Altria Corporate Services, Inc., the parent company of Philip Morris,[5] sent a letter to Jonathan K. Tart, Administration Officer for the Department, in which he briefly references an earlier conversation between the two men "about the order in which a taxpayer uses carryforward tax credits[.]" (R. 168.) He then conveyed the company's decision to amend its 2004 corporate tax return to recognize the amended statute's new base period for calculation of the Export Credit. Included with the letter was a schedule prepared by Philip Morris reflecting the order in which it intended to use Export Credits it had generated and carried forward from tax years 1999-2004, prior to the effective date of the amended statute. The letter does not address carryforward credits that Philip Morris contends were generated after the statute was amended. (R. 168.)

## V. ANALYSIS

24. Central to this matter is the Court's interpretation of the amended Export Credit Statute. Specifically, the issue is whether the addition of eight words to the Credit Subsection effective 1 January 2005 prevented Philip Morris from generating Export Credit in excess of $6 million from the effective date of the amendment until it discontinued exporting cigarettes produced in North Carolina in 2007.

---

[5] *See* Altria, *Our Heritage*, https://www.altria.com/en/about-altria/our-heritage#:~:text=Philip%20Morris%20Cos.%20is%20renamed,and%20Philip%20Morris%20 Capital%20Corporation (last visited 28 Sept. 2022).

25.    "The principal goal of statutory construction is to accomplish the legislative intent." *S&M Brands, Inc. v. Stein*, 2020 NCBC LEXIS 41, at *35 (N.C. Super. Ct. Mar. 24, 2020) (quoting *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018)).  Our Supreme Court has directed that "[t]he intent of the General Assembly may be found first from the plain language of the statute." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001).  "The process of construing a statutory provision must begin with an examination of the relevant statutory language." *Wilkie*, 370 N.C. at 547.

26.    Moreover, "[w]here words of a statute are not defined, the courts presume that the legislature intended to give them their ordinary meaning" within the context in which they are typically used.  *Parkdale Am. LLC. v. Hilton*, 200 N.C. App. 275, 279 (2009) (citation and internal quotation marks omitted).

27.    In addition, "[p]ortions of the same statute dealing with the same subject matter are to be considered and interpreted as a whole, and . . . every part of the law shall be given effect if this can be done by any fair and reasonable intendment[.]" *Huntington Props., LLC v. Currituck Cty.*, 153 N.C. App. 218, 224 (2002) (citation and internal quotation marks omitted).

28.    In all events, "[w]hen the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give it its plain and definite meaning." *State v. Jones*, 358 N.C. 473, 477 (2004) (quoting *Lemons v. Old Hickory Council, Boy Scouts of Am., Inc.,* 322 N.C. 271, 276 (1988)).

29.    While "the interpretation of a statute given by the agency charged with carrying it out is entitled to great weight[,]" *Home Depot U.S.A., Inc.*, 2015 NCBC

LEXIS 103, at **15 (quoting *Frye Reg'l Med. Ctr. v. Hunt*, 350 N.C. 39, 45 (1999)), the agency's interpretation is not controlling. *Campbell v. Currie, Comm'r of Revenue*, 251 N.C. 329, 333 (1959).

30. Finally, tax credits "are privileges, not matters of right, and are allowed as a matter of legislative grace[,]" and the taxpayer "must bring [itself] within the statutory provisions authorizing the [credit]." *Ward v. Clayton*, 5 N.C. App. 53, 58 (1969). *See also Aronov v. Sec'y of Revenue,* 323 N.C. 132, 140 (1988) ("The underlying premise when interpreting taxing statutes is: [t]axation is the rule; exemption the exception." (citations and internal quotation marks omitted)). Thus, "[a] statute providing exemption from taxation is strictly construed against the taxpayer[.]" *Aronov,* 323 N.C. at 140.

## A. The Plain Language of the Statute

31. The Court turns first to the plain language of the statute as amended. Philip Morris contends that the addition of the new $6 million limitation in the Credit Subsection applies only to a taxpayer's *use* of the credit and does not restrict its generation. Because the Department agrees that there was no limit on the amount of credit that could be generated each year prior to the amendment, Philip Morris argues that reading the amended Credit Subsection ("The amount of credit allowed may not exceed six million dollars ($6,000,000) and is computed as follows") to contain such a limit would constitute a substantive change. *See* N.C.G.S. § 105-130.45(b) (2003). And because neither the General Assembly nor the Department announced the addition of the language at issue as a substantive change, Philip Morris concludes

that no such change could have been intended. (Petitioner's Brief [hereinafter "Pet. Br."] 15, ECF No. 16.)

32. Philip Morris further argues that interpreting the language at issue as a substantive change "is contradicted by contemporaneous legislative statements and history." (Pet. Br. 14.) It contends that its lobbying efforts, conversations with the Governor's office, and the speed with which the General Assembly acted to accomplish this amendment all indicate to it that the intended effect of the amendment was to incentivize and reward Philip Morris for its role in supporting North Carolina's tobacco farmers, not to prevent it from using all the tax credits it generated. (*See* Pet. Br. 15–16.)

33. Philip Morris requested, and the General Assembly afforded it, an extension of both the date on which the Export Credit would sunset and the time frame in which Philip Morris could use accrued Export Credits. (Pet. Br. 16.) While Philip Morris acknowledges that the General Assembly made other changes to the Export Credit Statute that were not specifically designed for its benefit (e.g. changes in definitions, addition of the successor in business provision, a requirement that the manufacturer export through the North Carolina ports), Philip Morris does not recognize that the addition of language to the Credit Subsection operated to limit the amount of credit it could generate per year. In essence, Philip Morris argues, its communications with legislators and others lead it to conclude that the statute couldn't mean what it says.

34.     Philip Morris further contends that a $6 million limit on annual credit generation, which matches the statute's $6 million limit on the annual use of the credit, would render meaningless the amendment's extension of the carryforward period from five years to ten years. It argues that this result would effectively eliminate the benefit the company believes it was intended to receive. Instead, Philip Morris contends, the additional eight words must have been meant to apply only to the newly defined "successor in business." (Pet. Br. 8.)

35.     Philip Morris compares the language of the amended Export Credit Statute to the language of another statute, enacted at the same time, which authorized an enhanced tobacco tax credit for cigarette manufacturers satisfying certain employment requirements, N.C.G.S. § 105-130.46 (the "Enhanced Credit Statute"). The latter statute uses the word "earned" to describe a limit on credit generation, whereas the Export Credit Statute at issue uses the word "allowed." Philip Morris argues that failure to use the same word ("earned") to describe the generation limit in the Export Credit Statute indicates that the General Assembly did not intend to impose a limit on generation. (Pet. Br. 17–19.)

36.     In addition, Philip Morris cites *North Carolina Department of Revenue v. Hudson*, 196 N.C. App. 765 (2009), for its treatment of the word "allowed" in another tax credit statute, this one pertaining to qualified business income tax credits. (Pet. Br. 21.) In *Hudson* the Court of Appeals rejected the Department's argument that the word "allowed" limited the amount of credit that could be generated and determined that use of the word "allowed" in the statute before it was intended to

limit the amount of credit that could be claimed each year. *Hudson*, 196 N.C. App. at 769. Philip Morris argues that the same is true here. (Pet. Br. 21–22.)

37. The Department responds that these arguments are misguided. First, it observes that the testimony of Philip Morris' affiants is not competent to evidence the collective will of the General Assembly. Therefore, it argues, the testimony should be disregarded. (Respondent's Brief and Exceptions [hereinafter "Dept. Br."] 20, ECF No. 18.)

38. Returning to the plain language of the statute, the Department references the ALJ's reasoning that the manner in which the Export Credit Statute is structured supports the Department's position that $6 million was the maximum Export Credit a tobacco manufacturer could generate in any one tax year. It observes that the rules governing the calculation of credit generated in each tax year are in subsection (b), the Credit Subsection [105-130.45(b)], while the rules governing the amount of credit that can be claimed in each tax year—as well as whether unused credit may be carried forward for later use—are in subsection (c), the Cap Subsection [105-130.45(c)]. (Dept. Br. 9–10.) The language in question, ("[t]he amount of credit allowed may not exceed six million dollars ($6,000,000) and is computed as follows . . ."), was added to subsection (b), the Credit Subsection, and immediately precedes the calculation formula. Therefore, the Department argues, the limitation plainly applies to calculation of the credit generated, not its use. (Dept. Br. 10.)

39. The Department further observes that not interpreting the new language added to the Credit Subsection as a change and treating it as a mere repeat of the

preexisting cap on the use of the credit would "render[ ] the language in Subsection (b) meaningless, as mere surplusage, violating a fundamental principle of statutory construction." (Dept. Br. 11.)

40.     Finally, the Department distinguishes this matter from *Hudson* because that case does not involve an interpretation of the Export Credit Statute but instead involves the language and structure of two entirely different statutes, N.C.G.S. §§ 105-163.011(b1) and 105-163.012(a), which must be read in their own context. (Dept. Br. 18.)

41.     The Court concludes that Philip Morris' protestations premised on its lobbying efforts and communications with government officials cannot carry the day in the face of established principles of statutory interpretation. If the words of the statute are clear, the inquiry need go no further. *Lenox, Inc.*, 353 N.C. at 664. Such is the case here: a simple reading of the amended Export Credit Statute plainly indicates that the General Assembly intended to limit credit generation to six million dollars per year effective 1 January 2005.[6]

42.     It may well be that Philip Morris did not identify the addition of the limiting language as problematic given the speed in which this amendment was enacted, and it also may well be that a focus on the beneficial portions of the amendment distracted

---

[6] The Department takes exception to the ALJ's decision not to strike those portions of the affidavits of Joseph Beggans and John Rainey that purport to describe the intent of the General Assembly when enacting the Export Credit Statute. (Dept. Br. 12.) While recognizing that "courts are not at liberty to accept the understanding of any individual as to the legislative intent[,]" *D&W, Inc. v. City of Charlotte*, 268 N.C. 577, 582 (1966), given the ALJ's ultimate determination, the Court determines that any error, if one occurred, was harmless.

onlookers from the impact of the eight words injected as a limiting phrase in the Credit Subsection. Regardless of these possibilities, the Court is compelled to interpret the meaning of the statute from the words as they exist on the page. *See Thigpen v. Ngo*, 355 N.C. 198, 202 (2002) ("When the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction.").

43. The Court agrees with the ALJ that "[t]he General Assembly adopted a logical structure for the [Export] Credit Statute, putting the rules governing how a taxpayer can earn Export Credits and their calculation in the Credit Subsection, and the rules governing how much credit can be claimed and the carryforward of excess credits in the Cap Subsection." (R. 447.) The Court further agrees that the fact that the new limitation appears in the Credit Subsection means it should be read in the context of that subsection. (R. 448.) Contrary to Philip Morris' argument, reading the new language in the Credit Subsection, where it was placed, results in a second $6 million limitation—this one on credit generation—and not a repeat of the $6 million cap on use of the credit. Read as it is written, each word has meaning and there is no surplusage. *In re B.L.H.*, 376 N.C. 118, 122 (2020) (quoting *Porsh Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 556 (1981) ("It is presumed that the legislature . . . did not intend any provision to be mere surplusage.")).

44. Moreover, the drafters' decision to place the new words in the middle of the existing sentence that immediately precedes the calculation matrix makes it clear that the words were not intended to apply only to successors in business.

Furthermore, nothing about the structure and language choice for the Enhanced Credit Statute or for the qualified business income tax credit statute at issue in *Hudson* persuades the Court differently.

45. In short, the inquiry begins and ends with the plain language of the statute, and the General Assembly's clear drafting leaves nothing to be interpreted by the Court. "Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." *Burgess v. Your Hours of Raleigh, Inc.*, 326 N.C. 205, 209 (1990).

46. The statute, as amended, limited the amount of Export Credit Philip Morris could generate in a single year, as well as the amount it could claim in a year, to $6 million.

## B. The Department's Report and Other Communications Do Not Constitute an Interpretation or Erroneous Advice

47. Philip Morris argues that certain communications from the Department convey the Secretary of Revenue's interpretation of the amended statute and that it should be able to rely on those communications. It cites N.C.G.S. § 105-264(a), which reads in relevant part:

> When the Secretary interprets a law by adopting a rule or publishing a bulletin or directive on the law, the interpretation is a protection to the officers and taxpayers affected by the interpretation, and taxpayers are entitled to rely upon the interpretation.

N.C.G.S. § 105-264(a).

48. Philip Morris argues that in a statutorily required report issued in 2008, after the amendment was in effect, the Department wrote:

> Export volumes are those with respect to which credits were taken. Actual export volumes were well above those levels and resulted in the generation of credits above the $6 million cap. **These excess credits are available to be taken in future years**.

(R. 167.) According to Philip Morris, this statement demonstrates that the Department interpreted the amended statute to permit the generation of credits in excess of six million dollars, a position that contradicts the Department's current stance. (Pet. Br. 20.) Philip Morris argues that, at the very least, the report "illustrate[s] that the Department was aware of Philip Morris' interpretation of the statute and did not inform Philip Morris that it disagreed with its position." (Pet. Br. 20.)

49. In addition to this report, Philip Morris refers to the Department's Supplement to 2003 Tax Law Changes, which identifies the language at issue as a "clarifying change" rather than a substantive one. The Supplement states only that a change was made that "clarifies that the maximum allowable credit for cigarettes exported during a tax year is six million dollars, before applying the tax limitations provided for in subsection (c)." (R. 301.) Philip Morris argues that it should be able to rely on the Department's failure to identify the change as a substantive one.

50. Finally, Philip Morris claims to have received specific advice from the Department, and it argues that it should be able to follow that advice—even if it was erroneous—without incurring tax liability. It cites N.C.G.S. § 105-264(b), which reads:

> If a taxpayer requests specific advice from the Department and receives erroneous advice in response, the taxpayer is not liable for any penalty or additional assessment attributable to the erroneous advice furnished

by the Department to the extent that the following conditions are all satisfied:

(1) The advice was reasonably relied upon by the taxpayer.
(2) The penalty or additional assessment did not result from the taxpayer's failure to provide adequate or accurate information.
(3) The Department provided the advice in writing or the Department's records establish that the Department provided erroneous verbal advice.

N.C.G.S. § 105-264(b).

51.    In support of this argument, Philip Morris points to a letter it wrote to the Department regarding its use of carryforward tax credits accumulated prior to the amendment.  (R. 168.)  Again, Philip Morris argues that the Department was aware of Philip Morris' interpretation of the amended statute yet did nothing to inform it differently.

52.    The Department denies that its 2008 Report, the Supplement, or the letter it received from Philip Morris support Philip Morris' challenge to the Final Decision. (Dept. Br. 18–19.)  It argues that the 2008 Report does not qualify as a rule, bulletin, or directive reflecting the Secretary's interpretation.  (Dept. Br. 19.)[7]  Moreover, the Department contends that Philip Morris did not rely on the 2008 Report because it did not attempt to carry forward Export Credits that were identified in that report to the 2013–2014 tax years.  (Dept. Br. 19, citing R. 451.)

53.    The Court again turns to the plain language of the statute.  The documents upon which Philip Morris claims to rely are not rules, bulletins, or directives from the Secretary communicating the Secretary's interpretation of the law.  Therefore, they

---

[7] In response to the Court's questioning during the hearing, the Department contended that the Supplement was also not a rule, bulletin, or directive, although counsel expressed uncertainty regarding exactly how to categorize it.  (Hr'g Tr. 74:23–75:13.)

do not fall within the scope of N.C.G.S. § 105-264(a). Accordingly, the Court concludes that N.C.G.S. § 105-264(a) does not provide Philip Morris the protection it seeks.

54. Furthermore, the letter sent by Philip Morris to the Department fails to satisfy the requirements of subsection (b) of the statute. Philip Morris does not request advice from the Department on the proper way to calculate Export Credits following the amendment, and there is no document in the Record reflecting that any such advice was provided by the Department, either in writing or orally. Consequently, there is no evidence that Philip Morris reasonably relied on any such advice. Subsection (b) requires that each of these factors be satisfied. Because they are not, N.C.G.S. § 105-264(b) does not apply.

## VI. CONCLUSION

55. For the foregoing reasons, the Court concludes that that the ALJ did not err by awarding summary judgment to the Department. The position espoused by the Department and upheld in the Final Decision is consistent with the plain language of the statute. The Court therefore AFFIRMS the Final Decision, and the Petition for Judicial review is hereby DISMISSED.

IT IS SO ORDERED This the 29th day of September, 2022.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
  for Complex Business Cases